1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9               **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   CHIA THAO,                          No. CIV S-06-2206-CMK

12            Plaintiff,

13       vs.                             <u>MEMORANDUM OPINION AND ORDER</u>

14   COMMISSIONER OF SOCIAL
     SECURITY,

15
             Defendant.
16
     _____/
17

18            Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the consent of the parties, this case is before the undersigned for final decision on

21   plaintiff's motion for summary judgment (Doc. 19) and defendant's cross-motion for summary

22   judgment (Doc. 25).

23   / / /

24   / / /

25   / / /

26   / / /

# I.  PROCEDURAL HISTORY

Plaintiff first applied for social security benefits on April 3, 2000, with a protective filing date of March 22, 2000.  This application was denied in a decision dated January 16, 2002, and plaintiff did not seek any further review.  Plaintiff filed another application for benefits on May 28, 2003.  In both applications, plaintiff claims that disability began on June 1, 1992.  In an adult disability report submitted with her first application, plaintiff claimed her disability consists of a combination of "pain, headaches, dizziness, L-arm injured, L-arm, L-shoulder weakness, depress, poor concentration."  She also stated that she experiences low back pain, cannot stand, walk, bend, or lift, and that she has poor memory.  In a disability adult report submitted on April 29, 2003, in conjunction with the current application, plaintiff stated that her disability consists of a combination of "left arm problem, bad back, and mental health problem."  In her motion for summary judgment, plaintiff states:  "She suffers from the severe impairments of major depression, recurrent, and degenerative arthritis of the spine, left arm, and left shoulder."

Plaintiff's May 28, 2003, claim was initially denied.  Following denial of her request for reconsideration, plaintiff requested an administrative hearing, which was held on February 17, 2005, before Administrative Law Judge ("ALJ") Mark C. Ramsey.   In his March 22, 2005, decision, the ALJ made the following findings:

> 1.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability;
>
> 2.   The claimant's degenerative arthritis of the left arm, left shoulder and spine and depression are considered "severe" based on the requirements in the Regulations. . . .;
>
> 3.   These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No 4;
>
> 4.   The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision;

/ / /

5.      The claimant has the residual functional capacity to perform simple unskilled medium work tasks which involve occasional overhead reaching with the left arm and occasional fingering with the left hand; she is restricted from the climbing of ropes or scaffolding;

6.      The claimant has no past relevant work;

7.      The claimant is a "younger individual";

8.      The claimant has no formal education and is "unable to communicate in English";

9.      Although the claimant's non-exertional limitations do not allow her to perform the full range of medium work, using Medical-Vocational Rule 203.25, Appendix 2, Subpart P, Regulation No. 4 as a framework for decision-making and SSR 85-15, there are a significant number of jobs in the national economy that she could perform;

10.     The claimant has not overcome the presumption of continuing non-disability based on the prior Administrative Law Judge decision dated January 16, 2002; and

11.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. . . .

Plaintiff's request for review by the Appeals Council was granted and, on November 9, 2005, the Appeals Council issued a decision remanding the case to the ALJ. In the remand decision, the Appeals Council stated:

The decision indicates that the claimant has medically determinable impairments resulting in significant exertional and non-exertional limitations in performing no more than simple unskilled medium work not involving more than occasional overhead reaching with the left arm or occasional fingering with the left hand and no climbing of ropes or scaffolding. (citation to record omitted). In making this assessment, the decision assigned significant weight to the assessment by Dr. Borges at Exhibit C-6F and great weight to the assessments by the State agency review physicians. (citation to decision omitted).

However, Dr. Borges considered the claimant limited to frequent use of the left hand. This limitation is less restrictive than the occasional limitation to fingering assessed in the decision, but without further clarification, it may be more restrictive in possibly restricting all use of the hand [gross handling as well as fingering]. Additionally, both Dr. Borges and the State agency limited the claimant to occasional stooping which was not addressed in the decision. Further evaluation of medical source opinion is warranted. The decision relied upon Social Security Ruling [SSR 85-15] to conclude that the non-exertional limitations assessed in the

3

decision would not significantly erode the claimant's occupational base. Otherwise, there is no vocational evidence in the record regarding the extent to which the claimant's limitations erode the occupational base for medium work. However, SSR 85-15 provides that a limitation in gross manipulation, if supported, erodes the job base at all exertional levels and a limitation to occasional stooping substantially affects the job base for medium work because of the weights involved in lifting. Therefore, further assessment of the claimant's maximum sustainable residual functional capacity and the effects of non-exertional limitations on her job base are warranted.

On remand, the Appeal Council directed the ALJ to:

> 1. Give further consideration to the examining source opinion pursuant to the provisions of 20 C.F.R. 416.927 and Social Security Rulings 96-2p and 96-5p and non-examining source opinions pursuant to the provisions of 20 C.F.R. 416.927(f) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence. As appropriate, the Administrative Law Judge may request the examining source to provide additional evidence and/or further clarification of the opinion and medical source statements about what the claimant can still do despite the impairments (citation omitted);

> 2. Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (citations omitted); and

> 3. Obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (citation omitted). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (citation omitted). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve and conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titled (DOT) and its companion publication. . . .

A second hearing was held before the same ALJ on January 19, 2006. In his April 26, 2006, decision, the ALJ made the following new finding:

> Although the claimant's non-exertional limitations do not allow her to perform the full range of medium work, the vocational expert was able to identify multiple jobs which the claimant is able to perform.

/ / /

4

In the second decision, the ALJ did not rely on either Medical-Vocational Rule 203.25 or SSR 85-15.  The ALJ's conclusion regarding plaintiff's residual functional capacity was unchanged. After the Appeals Council declined review on August 7, 2005, this appeal followed.

## II.  SUMMARY OF THE EVIDENCE

**A.**   **Mental Impairments**

The certified administrative record ("CAR") contains records concerning plaintiff's mental impairments from the following sources:

1.   Psychiatric evaluation dated June 21, 2000, by agency examining psychiatrist Stephen M. Greenleaf, M.D. (CAR 173-77; Ex. B-7F);

2.   Mental residual functional capacity assessment with psychiatric review technique form dated July 15, 2000, by agency consultative physician (CAR 188-203; Exs. B-9F and B-10F);

3.   "Medical Assessment of Ability to do Work-Related Activities (Mental)" dated October 17, 2001, by treating physician Wu-Hsiung Su, M.D. (CAR 217-18; Ex. B-13F);

4.   Records covering the periods March 2003 through December 2004 and February 2005 through January 2006 from Sacramento County Mental Health (CAR 328-33, 339-52, 414-23, and 424-40; Exs. C-2F, C-4F, C-12-F, and C-13F);

5.   Psychiatric evaluation dated August 30, 2003, by agency examining physician Shohreh Ghaemian, M.D. (CAR 353-58; Ex. C-6F);

6.   Mental residual functional capacity assessment with psychiatric review technique form dated October 8, 2003, by agency consultative physician Rosemary Tyl, M.D. (CAR 373-90; Exs. C-8F and C-9F); and

7.   Psychiatric/psychological functional capacity questionnaire dated January 27, 2003, by treating psychiatrist David W. Smith, M.D. (CAR 410-13; Ex. C-11F).

/ / /

/ / /

/ / /

/ / /

1  　　　　<u>2000</u>

2  　　　　Dr. Greenleaf prepared a report on June 21, 2000, following a complete

3  psychiatric examination.  He noted in his report that "[t]here are no psychiatric records."

4  Plaintiff reported her chief complaint as depression.  Dr. Greenleaf provided the following

5  background:

6  　　　　The patient has been doing poorly since 1995.  She has headaches and
   　　　　musculoskeletal aches and pains.  She is a single mother and has trouble
7  　　　　supporting her family.  All of this has led to depression.

8  　　　　She has trouble with memory, attention, concentration, sleep, and appetite.
   　　　　She has felt suicidal but does not feel that way now.  She is not seeing  a
9  　　　　psychiatrist.  She is on Elavil 25 mg and it does help some.
   　　　　The patient believes she is disabled for reasons described above.

10

11  Regarding plaintiff's current level of functioning, Dr. Greenleaf noted that plaintiff lives in an

12  apartment with her children, knows how to drive a car, can dress and bathe herself, and gets

13  along fairly well with people.  On mental status examination, Dr. Greenleaf observed that

14  plaintiff is "normoproductive, logical, and coherent" and that her affect is "mildly depressed."

15  He assigned plaintiff a global assessment of functioning ("GAF") score of 60 on a 100-point

16  scale.  Dr. Greenleaf opined that plaintiff could follow simple commands and safety rules,

17  function in an environment with little peer or public contact, tolerate reasonable constructive

18  criticism, work adequately with others, and get to work promptly.

19  　　　　On July 15, 2000, an agency consultative doctor completed a mental residual

20  functional capacity assessment and psychiatric review technique form.  The doctor concluded

21  that plaintiff was not significantly limited with respect to the following:  (1) ability to perform

22  activities within a schedule, maintain regular attendance, and be punctual; (2) ability to sustain an

23  ordinary routine; (3) ability to make simple work-related decisions; (4) ability to interact

24  appropriately with the public; (5) ability to ask simple questions or request assistance; (6) ability

25  to get along with co-workers; (7) ability to maintain socially acceptable behavior; (8) ability to

26  respond to changes in the work setting; (9) ability to be aware of hazards; and (10) ability to

travel and use public transportation.  The doctor concluded that plaintiff was moderately limited with respect to:  (1) ability to understand and remember detailed instructions; (2) ability to carry out detailed instructions; (3) ability to maintain attention and concentration for extended periods; (4) ability to work in coordination with others without being distracted; (5) ability to complete normal work-day routines without interruption from psychologically based symptoms; (6) ability to accept instructions and criticism from supervisors; and (7) ability to set realistic goals.  The doctor noted that there was no evidence of limitation with respect to:  (1) ability to remember locations and work-like procedures; (2) ability to understand and remember very short and simple instructions; and (3) ability to carry out very short and simple instructions.  Plaintiff was not assessed with marked or severe limitations in any category of functioning.

<u>2001</u>

The record contains an assessment by Dr. Wu-Hsiung – plaintiff's treating physician – of plaintiff's mental capability to do work-related activities.  This two-page report, dated October 17, 2001, does not reference any objective findings.  Dr. Wu-Hsiung assessed that plaintiff's ability to do the following activities was either "fair" or "poor or none":  (1) follow work rules; (2) relate to co-workers; (3) deal with the public; (4) use judgment; (5) interact with supervisors; (6) deal with work stresses; (7) function independently; (8) maintain attention and concentration; (9) carry out detailed instructions; (10) carry out simple instructions; (11) maintain personal appearance; (12)  behave in a socially acceptable manner; and (13) demonstrate reliability.

<u>2002</u>

The CAR does not appear to contain any records from 2002 regarding plaintiff's mental impairments.

/ / /

/ / /

/ / /

1          <u>2003</u>

2          Dr. Smith – plaintiff's treating psychiatrist – completed a functional capacity

3  questionnaire on January 27, 2003.  He diagnosed plaintiff with "major depression, recurrent."

4  Dr. Smith described plaintiff's symptoms as:  "depressed mood, tearful, limited sleep. . . ."[1]

5  Other than referencing this description of plaintiff's subjective symptoms, Dr. Smith's report

6  does not recite any objective clinical findings.  He indicated that plaintiff's prognosis was

7  guarded and that plaintiff had not shown significant improvement.  Dr. Smith assessed plaintiff's

8  ability to do the following activities as severely impaired:  (1) relate to other people; (2) perform

9  daily activities; and (3) perform complex tasks in a full-time work setting.  He assessed

10  plaintiff's limitations as moderately severe in the following areas:  (1) ability to work with

11  minimal contact with others; (2) ability to perform work requiring frequent contact with others;

12  and (3) ability to concentrate.  Dr. Smith assessed a moderate level of deterioration in plaintiff's

13  personal habits.  He opined that plaintiff was moderately limited in her ability to comprehend

14  instructions and perform simple tasks in a full-time work setting.

15          On August 30, 2003, Dr. Ghaemian reported on his comprehensive psychiatric

16  examination of plaintiff.  In his report, Dr. Ghaemian provided the following summary of the

17  records:

18          Our office has received a copy of the claimant's initial psychiatric
          evaluation from Sacramento County Adult Mental Health Services APSS
19          Clinic, dated March 18, 2003.  The report is handwritten, and mostly
          illegible, and not fully presented.  The Axis I diagnosis appears to be
20          major depressive disorder without psychosis, as well as dysthymic
          disorder.  The claimant achieved a GAF of 50 at the time.  No treatment
21          plan was indicated during this evaluation.  No prior psychiatric or medical
          reports were following this report.
22
          There is only one adult psychiatric support service clinic medication
23          summary dating mostly through 2003, which is representative of her
          Wellbutrin increased to 75 mg on one appointment, as well as Seroquel 25
24          mg at night, Celexa, and Wellbutrin.  It also indicated the claimant taking
          Zyprexa since June 2003, with unknown dosage.  Continuation of
25

26          [1]       There is an additional word in his description which is illegible.

treatment and more follow-up was not available.

We also have received a copy of the claimant's filed application from
Department of Social Services. The claimant reported her disability as bad
back, mental health problems, left arm problems, unable to lift or carry
weight because of left hand pain, as well as mental problems that make it
hard for her to deal with daily life.

Dr. Ghaemian diagnosed plaintiff with mood disorder, not otherwise specified, but added "rule

out malingering." He was unable to assign a GAF score due to incomplete information. Dr.

Ghaemian described his objective observations as follows:

The claimant presented as mildly dysphoric. She became tearful during
the interview. She has a history of depression, per prior psychiatric
evaluation during the past few months. The claimant is taking multiple
antidepressants as well as antipsychotics. During the interview, the
claimant did not present as severely depressed or psychotic. No symptoms
of psychomotor retardation or agitation were observed. No indication of
overt psychosis was noted. Current complaint, as well as the nature of the
claimant's current psychopathology is questionable and unclear. The
claimant stated that she is totally confused. She was not able to spell or
calculate. She was not able to identify her home address or home phone
number. However, she stated that she has a driver's license and drives
around. These are contradictory to this writer. Hence, the claimant's true
functional state at this time is not clear.

Regarding plaintiff's functional capabilities, Dr. Ghaemian opined:

Based on current mental status exam, the claimant's linguistic and
educational level and poor background, as well as possible presence of
mild dysthymic disorder, the claimant is capable only of performing a[]
simple and repetitive job on a regular basis in a work-like environment.

Her ability to perform detailed and complex job[s] is questionable, and
needs long-term training and reassessment.

The claimant appears to be capable of concentrating for an eight-hour
simple job; she is able to respond . . . appropriately to minimal stressors in
a job setting or basic changes in a work-like environment.

Agency consultative doctor Rosemary Tyl completed a mental residual functional

capacity assessment with psychiatric review technique form on October 8, 2003. She assessed

plaintiff as moderately limited in the following areas: (1) ability to understand and remember

detailed instructions; (2) ability to carry out detailed instructions; (3) ability to maintain attention

and concentration for extended periods; (4) ability to complete a normal work day without

interruptions from psychological symptoms; and (5) ability to interact appropriately with the general public.  In all other areas, Dr. Tyl concluded that plaintiff was not significantly limited.

Records from Sacramento County Mental Health are largely illegible.  In her motion for summary judgment, plaintiff offers a summary of those records.  However, while the record contains documents dated in 2003, plaintiff states in her summary that she was treated in 2004, 2005, and 2006 only.  She does not summarize any records from Sacramento County Mental Health dated in 2003.

<u>2004, 2005, and 2006</u>

The only remaining mental health records are from Sacramento County Mental Health.  As noted above, those records are largely illegible.  Plaintiff, however, provides the following summary of these records:[2]

> Ms. Thao was treated on April 21, 2004, November 3, 2004, December 22, 2004, April 23,  2005, March 24, 2005, June 29, 2005, January 5, 2005, January 27, 2005, February 2, 2005, February 23, 2005, February 24, 2005, March 25, 2005, May 23, 2005, September 7, 2005, September 27, 2005, June 19, 2005, January 9, 2005, March 24, 2005, April 21, 2005, June 1, 2005, July 18, 2005, September 14, 2005, and January 9, 2006. TR 424-440.
>
> Ms. Thao was consistently treated for major depression recurrent. She was also treated for  insomnia on every occasion she was seen by Dr. Smith.  For her depression and anxiety, she was treated with Cymbalta, Celexa, Wellbutrin, Effexor, and Abilify. TR 424-440.  For her insomnia, Ms. Thao was treated with Trazodone, Lorazepam, Florazepam, Halcion, Restoril, and Seroquel. TR 424-440.  She was also treated with Klonopin for her anxiety symptoms.
>
> February 24, 2005, treatment notes indicated that Ms. Thao was taking Effexor, Dalmane, and Klonopin.  Notes indicated that she was being treated for depression and had trials of Wellbutrin and Effexor. Notes indicated she continued to have sleeping problems and had not done well on Restoril, Dalmane, or Seroquel, and was sleeping only two hours per night.  Notes indicated that a friend reported Ms. Thao spent most of her day lying on the couch and Ms. Thao indicated she had a sensation that someone was touching her, but no one was there.  Notes indicated that she always took her medication but was depressed 2-3 days out of 10. TR 432. She presented herself as subdued and downcast. *Id.*

---

[2]      References to "TR" indicate citation to the certified administrative record.

March 24, 2005, treatment notes reflected the following DSM-IV diagnoses:

| | | |
|---|---|---|
| Axis I: | | Major depression, recurrent. |
| Axis II: | | V7109. |
| Axis III: | | Mild obesity. |
| Axis IV: | | Acute and chronic primary support problems, acute and chronic social environment problems, acute and chronic educational problems, acute and chronic occupational problems. |
| Axis V: | | Current GAF: 55. |

TR 431.

The assessment was: "The patient remains depressed in spite of medication changes. . . . failed on Effexor and Abilify." TR 431.

June 1, 2005, treatment notes indicated that Ms. Thao reported being more depressed and continued to have sleeping difficulties. Her mood was depressed, her affect was blunted. She was currently taking Klonopin, Cymbalta, and Halcion. TR 429.

June 29, 2005, treatment notes indicated that Ms. Thao was feeling better with her current medications including Cymbalta.  Notes indicated that she always took her medications. TR 428.

July 18, 2005, treatment notes indicated that Ms. Thao was seen for major depression.  She reported sleeping a very short time each night, being very tired with headaches, back pain, heartburn, and persistent pain in her left arm, and indicated that her pain problems were causing her not to sleep well.  Notes indicated that Ms. Thao's sleep failed to improve with Seroquel, Dalmane, Atavan, Restoril and Halcion.  She was also being treated with Trazodone for sleeping and Doxepin for her depression. Ms. Thao's was assessed as a 2/10– more depressed with a flatter affect. Notes indicated that she always took her medications properly. TR 427.

September 14, 2005, treatment notes indicated that Ms. Thao was depressed and had pain in her knees.  Notes indicated that Ms. Thao was "painfully flat" and had dropped from a 7/10 mood in June to a 2/10 presently.  Notes reflected she was worried about a number of physical complaints and was currently using Cymbalta and Wellbutrin.  Notes indicated that she was always medication compliant. TR 426.

January 9, 2006, treatment notes indicated that Ms. Thao was still being treated for major depression recurrent.  Symptoms included minimal interest in her home chores and pain in many parts of her body which were unexplained.  She exhibited poor sleep, tearfulness, and a depressed mood.

/ / /

/ / /

11

Notes reflected that Ms. Thao thought about death but would remain alive for her children, and was always medication compliant. TR 425.  Ms. Thao had the following DSM-IV diagnoses:

| | | |
|---|---|---|
| Axis I: | Major depression, recurrent. |
| Axis II: | None. |
| Axis III: | None. |
| Axis IV: | Acute and primary support group problems, acute and chronic educational problems; acute and chronic economic problems. |
| Axis V: | Current GAF: 55. |

TR 424.

Notes indicated that if Ms. Thao did not respond to the Cymbalta, she would be referred for further psychiatric treatment as she had been treated for almost three years and remained significantly depressed. TR 424.

March 17, 2003, treatment notes indicated that Ms. Thao had a current GAF of 50, and a past year's GAF of 55.  Notes indicated that Ms. Thao also reported pain in her left arm and pain in her lower extremities. TR 332.  Notes reflected that Ms. Thao's reliability was judged to be good. TR 331.  Ms. Thao was further treated for the same ailments on March 18, 2003 (TR 331, 332, 333, 334), and on April 2, 2003. TR 329.

During the period, April 28, 2003, through August 24, 2003, Ms. Thao was treated for depression combined with pain syndrome.  It was noted that her mood was depressed, she was tearful, and was being treated with Lexapro, Seroquel and Wellbutrin.  She was diagnosed with major depression, recurrent.  Her Lexapro was discontinued and she was started on Effexor on July 16, 2003.  It was indicated that Ms. Thao was always medication compliant.  She was also treated with Restoril for her insomnia. TR 350-351.

Treatment notes of August 21, 2003, October 9, 2003, and November 25, 2003, indicated that Ms. Thao was treated for major depression, recurrent, and insomnia with Effexor, Restoril, Klonopin, Dalmane, Abilify, and Seroquel. TR 349.  Treatment notes of January 15, 2004 (TR 343), November 24, 2004 (TR 344), October 9, 2003 (TR 346) and September 8, 2003 (TR 347), indicated that Ms. Thao continued to be treated for major depression, recurrent. and insomnia.  She indicated that she had severe pain and felt very dizzy.  She was treated also with Piroxicam to relieve her pain.  Ms. Thao continued to report poor sleep and nightmares of being chased.  Ms. Thao was observed to be in a persistent depressed mood.

Medication notes of January 5, 2004, indicated that Ms. Thao had been treated with Abilify, Klonopin, Dalmane, Wellbutrin, Seroquel, Lexapro, Effexor, and Atavan. TR 340-341.

///

12

**B.**     **Physical Impairments**

The CAR contains records concerning plaintiff's physical impairments from the following sources:

    1.    Records covering the period July 1999 through August 1999 from Health For All, Inc. (CAR 142-44; Ex. B-1F);

    2.    Records covering the periods October 1999 through August 2000 and March 2001 through October 2001 from treating physician Dr. Wu-Hsiung (CAR 145-54 and 205-16; Exs. B-2F and B-12F);

    3.    Physical residual functional capacity assessment dated October 24, 2000, by agency consultative physician (CAR 158-65; Ex. B-4F);

    4.    Report dated October 26, 1999, of left elbow by Robert Lincoln, M.D. (CAR 166; Ex. B-5F);

    5.    Neurologic evaluation dated June 14, 2000, by agency examining physician Rebecca Jordan, M.D. (CAR 167-72; Ex. B-6F);

    6.    Physical residual functional capacity assessment dated June 29, 2000, by agency consultative physician (CAR 178-87; Ex. B-8F);

    7.    Assessment of physical capabilities dated October 17, 2001, by treating physician Dr. Wu-Hsiung (CAR 219-21; Ex. B-14F);

    8.    Assessment of physical capabilities dated April 11, 2003, by treating physician Dr. Wu-Hsiung (CAR 335-37; Ex. C-3F);

    9.    Orthopedical evaluation dated September 8, 2003, by agency examining physician Gabriel S. Borges, D.O. (CAR 359-64; Ex. C-6F); and

    10.    Physical residual functional capacity assessment dated September 19, 2003, by agency consultative physician Thien Nguyen, M.D. (CAR 365-72; Ex. C-7F).

<u>1999</u>

Records from Health For All dated July 1999 are largely illegible.  Treatment notes dated August 16, 1999, indicate that plaintiff has a history of trauma as a small child and is now having "bonny [sic] deformity" of the left arm.  Objectively, the notes indicate a left arm deformity at the left elbow but no atrophy.  Plaintiff was provided Naproxsyn for pain.  X-rays were ordered.

/ / /

An October 26, 1999,  x-ray of plaintiff's left elbow revealed:

. . . There is prominent dysplasia at the left elbow.  The dietal humerus, as well as the proximal ulna and proximal radius, are misshapen.  There is a bony fragment that likely is the residua of a capitellum, and this may have arisen from a fracture several years ago.  No acute fracture is identified today.  Note that there is also both thinning or tubulation of the proximal ulna.  The proximal ulna articulates with the dietal humerus.  No joint effusion is evident.

A "Problems and Medication List" from plaintiff's treating physician – Dr. Wu-Hsiung at Zinfandel Medical Group – contains an October 26, 1999, entry for "deformed arm." The following is a summary of Dr. Wu-Hsiung's treatment notes for the remainder of 1999:[3]

| 11-4-1999 | Left arm weak. |
| 12-7-1999 | Have seen neurologist; arthritis.[4] |

<u>2000</u>

Plaintiff continued her treatment with Dr. Wu-Hsiung in 2000.  The following is a summary of the doctor's notes:

| 1-5-2000 | Patient seen by neurologist; muscular atrophy.[5] |
| 2-4-2000 | Pain, weak; use arm braces. |
| 7-26-2000 | Left arm; old fracture/dislocation & nerve loss; passive range of motion; general body pain. |

There is also a treatment note dated August 28, 2000, which appears to relate to a pregnancy. The doctor's notes are largely illegible and it does not appear that this particular note documents any information concerning the physical impairments at issue in this case.

/ / /

/ / /

---

[3]    Treatment notes dated December 23, 1999, are illegible.

[4]    The CAR does not contain any records for this neurological consultation.

[5]    It is unclear whether this refers to a second neurological consultation.  In any event, there are no records of any neurological consultations prior to January 2000.

14

Agency examining doctor Jordan prepared a report on June 14, 2000, following a complete neurologic examination of plaintiff. In her report, Dr. Jordan provided the following history of plaintiff's physical impairments:

> The claimant complains of left arm weakness dating back to 1979. She says she fell and hit her elbow on a rock. She did not undergo any specific treatment at that time. She reports having had left elbow pain since then. Pain is now noted to be on and off, said to involve the left arm from the elbow up to the shoulder and going down to the hand. it is aggravated by lifting. Intensity is 4-10/10 with severe pain noted once or twice a day.
>
> She also complains of pain in the upper and the lower back dating back 4 years. Pain is on and off with intensity of 4-10/10. It is aggravated by lifting. Severe pain is noted 2-3 times a day.

On examination of plaintiff's musculoskeletal system, Dr. Jordan reported:

> . . . She can fully flex and extend at the elbows. She can raise both arms up. She has grossly full range of motion of joints although she tends to move the left upper extremity slowly. She complains of tenderness in the left shoulder, elbow, and wrist even with very light touch. There is no swelling, redness, nor excessive warmth. There is no apparent joint instability or subluxation.

Dr. Jordan also reported as follows on plaintiff's motor abilities:

> Tone is normal. There is no pronator drift. On challenge, she tends to give poor effort and give-way "weakness" on testing of the left upper extremity. Strength is otherwise 5/5 in all limbs. She can do fine motor tasks. Dynamometer grip is as follows: right: 40, 40, 40 lbs.; left 10, 4, 4, lbs. There is no tremor or other involuntary movement.

Dr. Jordan's impressions were:

> 1.      Subjective complaints of pain in the upper and lower back, with no significant associated objective findings on examination, with some exaggerated complaints of tenderness.
> 2.      Complaints of left arm pain and weakness, with slight difference in forearm circumferences but also with additional function overlay. She has exaggerated complaints of tenderness, poor effort, and give-way "weakness" on strength testing.

/ / /

/ / /

/ / /

15

Finally, Dr. Jordan offered the following functional capacity assessment:

> While the claimant has subjective complaints as indicated above, examination shows limited associated objective findings and apparent additional functional or non-organic overlay.  She can walk without any assistive device.  Sitting, standing, and walking are estimated at 2 hours continuously and 6 hours total.  She is able to reach, handle, manipulate, and use push-pull devices and foot controls.  Lifting and carrying is estimated at 25 lbs. frequently and 50 lbs. occasionally, based mainly on subjective complaints with limited examination findings.  Examination is otherwise benign and reveals no objective findings of other significant physical limitation.

On June 29, 2000, an agency consultative doctor completed a physical residual functional capacity assessment form.  The doctor assessed that plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds, stand/walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day with normal breaks.  The doctor opined that plaintiff was unlimited in her ability to push and/or pull and did not think the record established any postural, visual, communicative, or environmental limitations.  As to manipulative limitations, the doctor stated that plaintiff was limited in her ability to do tasks involving handling and fingering.

On October 24, 2000, another agency consultative doctor completed a physical residual functional capacity assessment form.  The assessment was the same as the one completed on June 29, 2000, except this doctor found that plaintiff did not have any manipulative limitations.

2001

Progress notes from Dr. Wu-Hsiung covering the period March 2001 through October 2001 are illegible and plaintiff provides no summary of these records.

On October 17, 2001, plaintiff's treating physician – Dr. Wu-Hsiung – completed a medical assessment of plaintiff's physical capabilities.  Dr. Wu-Hsiung's primary diagnosis was arthritis with a secondary diagnosis of hypothyroidism.  The doctor opined that plaintiff's impairments limited her ability to walk, stand, sit, and carry.  Specifically, he opined that plaintiff could walk less than one hour without interruption; stand less than one hour without interruption;

1    and sit one to two hours.[6]  As to plaintiff's ability to carry and/or lift, Dr. Wu-Hsiung stated that

2    plaintiff could occasionally lift/carry up to ten pounds, but never lift/carry more weight than that.

3    The doctor also felt plaintiff was totally precluded from climbing.  Dr. Wu-Hsiung stated that

4    plaintiff was limited in her ability to bend, but did not indicate a total restriction on tasks

5    involving bending.  He added that plaintiff would require rest periods, but did not specify the

6    amount or duration of rest plaintiff needed.  Dr. Wu-Hsiung did not feel that plaintiff was

7    capable of the full range of even sedentary work and did not feel that plaintiff's condition would

8    improve.

9            In the October 17, 2001, assessment, Dr. Wu-Hsiung stated that his assessment

10   was based on "physical sign, laboratory" although no specific objective findings are noted.  The

11   only "finding" listed are:  "pain on the limbs and headache, general weakness," "weakness,

12   pain," and ". . . weakness, pain, depression."  Again, while the doctor references generally

13   "clinical correlation" and "poor therapeutic response," no actual clinical findings are mentioned.

14           2002

15           As with plaintiff's mental impairments, the CAR does not appear to contain any

16   records from 2002 regarding plaintiff's physical impairments.

17           2003

18           The record contains a second physical capacity assessment from Dr. Wu-Hsiung.

19   In a form completed on April 11, 2003, Dr. Wu-Hsiung stated that, in an eight-hour day, plaintiff

20   could only stand/walk/sit for up to two hours at a time for up to a total of four hours due to "pain,

21   weakness."  Dr. Wu-Hsiung stated that plaintiff was not limited with respect to repetitive hand

22   and/or finger movements but that plaintiff was restricted in her ability to use her feet for

23   repetitive movements, again due to "pain and weakness."  For plaintiff's lift/carry ability, the

24   _____

25           [6]     It is unclear whether Dr. Wu-Hsiung felt that plaintiff could sit for one to two
      hours without interruption or would require breaks.  The doctor checks a space on the form for
26   "without interruption" next to "less than one hour" but also checks the space for "total" next to
      "one to two hours."

doctor indicated that she could occasionally lift up to ten pounds.  The doctor stated that plaintiff

could never balance, but could occasionally climb, stoop, kneel, crouch, crawl, and reach.

Agency examining doctor Borges reported on a September 8, 2003,

comprehensive orthopedic evaluation of plaintiff.  On physical examination, Dr. Borges noted

that plaintiff's range of motion test results were all "[g]rossly within normal limits," with the

exception of plaintiff's shoulder joints.  As to her shoulders, Dr. Borges reported:

> SHOULDER JOINTS:  Right shoulder forward flexion 0-150 degrees, extension 0-40 degrees, abduction 0-150 degrees, adduction 0-30 degrees, internal rotation 0-80 degrees, external rotation 0-90 degrees.  Left shoulder forward elevation 120 degrees, abduction 110 degrees, adduction 30 degrees external and internal rotation 60 degrees.

Dr. Borges' general findings were "left glenohumeral shoulder tenderness to palpation with

crepitus" and "L4-L5 spinal tenderness to palpation."  His diagnoses were:

> 1.       Left shoulder pain; cannot rule out rotator cuff tendonitis or impingement syndrome.  Objective findings did reveal positive Hawkin's tests with decreased range of motion and palpatory tenderness with crepitus noted in her left shoulder.  Cannot rule out also degenerative arthritis of the left glenohumeral joint.
>
> 2.       Back pain likely secondary to degenerative arthritis and muscoluskeletal mechanical pain.  Objective findings did reveal some palpatory tenderness with decreased range of motion.  However, neurovascularly intact.

Dr. Borges offered the following functional capacity assessment:

> Based on the above objective findings, I think the claimant does have some mild functional limitations in regards to her left shoulder findings and her back findings.
>
> As this time, I think the claimant could sit 6-8 hours a day with normal customary breaks.
>
> I think she could walk or stand six hours a day on a non-continuous basis.
>
> I would limit overhead reaching to an occasional basis on the left; no limitations on the right.  I would limit the use of her hands to frequent basis on the left, no limitations on the right.

///

> I would avoid any climbing secondary to a fall risk.  I would limit any continuous bending, squatting, or stooping to an occasional basis because of her back findings.
>
> There is a communicative barrier.  Otherwise, there are no other auditory, visual, or communicative limitations.
>
> This is no need of assistive devices.
>
> I think the claimant could follow simple commands and tasks and handle funds if asked.

Agency consultative doctor Nguyen completed another physical residual functional capacity assessment on September 19, 2003.  As with the prior assessments, Dr. Nguyen found that plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds, stand/walk about six hours in an eight-hour day, and sit about six hours in an eight-hour day with normal breaks.  Dr. Nguyen also concluded that plaintiff was unlimited in her ability to push/pull.  As to postural limitations, Dr. Nguyen determined that plaintiff could occasionally climb stairs and ramps, but never climb ropes or scaffolds.  The doctor opined that plaintiff could only occasionally stoop or crouch, but could frequently balance, kneel, and crawl.  As to manipulative limitations, Dr. Nguyen concluded that plaintiff was unlimited on the right side, but limited in her ability to reach and finger on the left.  The doctor added:

> Clmt has decreased ROM of LUE w/ tenderness and + Hawkins test, she should be able to perform <u>occasional overhead reaching</u> and <u>frequent fingering only</u>.  (emphasis in original).

Dr. Nguyen did not find any visual, communicative, or environmental limitations.

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See <u>Saelee v. Chater</u>, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV.  DISCUSSION

In her motion for summary judgment, plaintiff raises the following four arguments:

1. The ALJ failed to recontact Dr. Borges and clarify Dr. Borges's opinion with respect to the limitation associated with Ms. Thao's left hand[7] although advised to do so by the Appeals Council;

2. The ALJ failed to accurately reflect and credit the opinions of Ms. Thao's treating psychiatrist, Dr. White,[8] treating physician, Dr. Wu-Hsiung, and Dr. Borges, the consultative examiner;

3. The ALJ failed to properly assess Ms. Thao's residual functional capacity; and

/ / /

---

[7]  Given that plaintiff also discusses her back impairment, this argument does not appear to be limited to Dr. Borges' opinion regarding plaintiff's left hand.

[8]  Plaintiff's treating psychiatrist is Dr. Smith.

4.      The ALJ failed to include all Ms. Thao's limitations in the hypothetical posed to the vocational expert (VE), and failed to inquire of the VE whether her testimony conflicted with the Dictionary of Occupational Titles. . . .

## A.      Evaluation of the Medical Opinions

Plaintiff's first and second arguments concern the ALJ's assessment of Dr. Borges' opinion.  Plaintiff's second argument concerns the ALJ's assessment of the opinions of Drs. Smith and Wu-Hsiung.  Generally, the weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

1    finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

2    legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

3    professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

4    without other evidence, is insufficient to reject the opinion of a treating or examining

5    professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

6    conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

7    1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

8    see also Magallanes, 881 F.2d at 751.

9              1.    Dr. Borges

10             Plaintiff argues generally that the ALJ failed to accurately assess Dr. Borges'

11   opinion.  More specifically, plaintiff contends that the ALJ failed to recontact Dr. Borges for

12   additional information necessary to clarify his opinion despite the Appeals Council's suggestion

13   that the ALJ may need to do so.  As to plaintiff's specific argument, the ALJ has an independent

14   duty to fully and fairly develop the record and assure that the claimant's interests are considered.

15   See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  This requires the ALJ to

16   "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."

17   Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978).   Ambiguous evidence or the ALJ's own

18   finding that the record is inadequate triggers this duty.  See id.  The ALJ may discharge the duty

19   to develop the record by submitting questions to the claimant's physicians (i.e., recontacting the

20   physician).  See id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998)).

21             Initially, the court notes that the Appeals Council directed the ALJ to give further

22   consideration to Dr. Borges' opinion and indicated that, "[a]s appropriate, the Administrative

23   Law Judge may request the examining source to provide additional evidence and/or further

24   clarification of the opinion and medical source statements. . . ."  Therefore, the Appeals Council

25   remand order did not require the ALJ to recontact Dr. Borges.  Instead, the ALJ was encouraged

26   to do so only if appropriate.  Under the standards outlined above, recontacting the doctor would

1    have been appropriate if the ALJ was unable to evaluate Dr. Borges' opinion because the

2    evidence of record was either inadequate or ambiguous.

3            Next, it is helpful to compare the ALJ's findings from the first decision with those

4    in the second concerning Dr. Borges in order to ascertain whether the evidence was either

5    inadequate or ambiguous to support the ALJ's re-evaluation.  In his March 22, 2005, decision,

6    the ALJ stated as follows regarding Dr. Borges:

7            The claimant underwent an orthopedic evaluation by Gabriel Borges, DO,
             in September 2003.  Dr. Borges reported complaints of back and left arm
8            pain.  Dr. Borges observed a normal gait.  The claimant was able to sit and
             get on and off the examination table; walk to the examination table; lie
9            supine; and sit without assistance.  There was left glenohumeral shoulder
             and L4-5 spinal tenderness to palpation with shoulder crepitus noted.  The
10           claimant has no effusion, dislocation, or erythema.  There were objective
             findings of positive Hawkins's tests with decreased range of shoulder
11           motion and some decreased range of spinal motion.  However, the
             claimant was neurovascularly intact.  Dr. Borges noted that he could not
12           rule our rotator cuff tendinitis, impingement syndrome, or degenerative
             arthritis of the left shoulder.  Dr. Borges assessed degenerative arthritis of
13           the spine and musculoskeletal mechanical pain.  (Ex. C-6F).

14                              * * *

15           . . . Dr. Borges assessed that, based on the objective findings, the claimant
             had mild functional limitations in regards to her left shoulder and back.
16           He opined that the claimant could sit for six-eight hours a day with normal
             customary breaks; walk/stand for six hours a day on a non-continuous
17           basis; bend, squat, or stoop occasionally; reach overhead occasionally on
             the left with no limitations on the right; and use her hand on the left
18           frequently with no limitations on the right. . . .  The undersigned finds the
             opinion[] of Dr. Borges . . . persuasive, consistent with the record, and
19           well-supported by objective findings and, therefore, accords them
             significant weight.

20

21    The ALJ concluded (in both decisions) that plaintiff's residual functional capacity allowed for

22    simple unskilled medium work tasks "which involve . . . occasional fingering with the left hand."

23    In other words, the ALJ concluded that plaintiff could not perform more than occasional left

24    hand fingering.  The ALJ's residual functional capacity assessment does not include any

25    limitation regarding the ability to stoop.

26    ///

The Appeals Council remanded so that the ALJ could address two points – plaintiff's ability for left hand gross manipulation and plaintiff ability to stoop.  Specifically, as to left hand manipulation, the Appeals Council noted that Dr. Borges' opinion that plaintiff could frequently use her left hand was less restrictive than the ALJ's assessment to only occasional fingering but possibly more restrictive with regards to handling (i.e., gross manipulation).  As to stooping, the Appeals Council observed that the ALJ's decision did not account for Dr. Borges' limitation to only occasional stooping.

In the second decision dated April 26, 2006, the ALJ recited the same summary of Dr. Borges' findings and opinions.  In the sequential evaluation section of the second decision, the ALJ discussed the Appeals Council remand order with respect to left hand limitations as follows:

> The undersigned notes that this case was remanded in part, because the appeals council requested further evaluation of Dr. Borges' opinion.  The appeals council noted that Dr. Borges' opinion of a limitation to "frequent use of the left hand" may be more restrictive than the undersigned determination of a limitation . . .[to] occasional fingering of the left hand because Dr. Borges' limitations restrict the hand which includes gross handling as well as fingering.  The undersigned has again reviewed Dr. Borges' report and notes that abnormal finding[s] were limited to the claimant's shoulder and there were no abnormal findings in regards to the claimant's hands.  Reviews of the treatment records from We Care Medical center also do not show abnormalities in the claimant's left hand.
>
> The physicians with the Disability Determination Service found that the claimant was able to perform frequent fingering and that there were no limitations in handling (See Exhibit C-7F).  Thus, the undersigned finding of a limitation to occasional fingering in the left hand is giving the claimant the benefit of the doubt and the undersigned does not find support for a finding of limitations in handling with her left hand.

Thus, upon re-evaluation of Dr. Borges' report, the ALJ concluded that, to the extent Dr. Borges opined that plaintiff was limited with respect to handling, such a limitation was rejected.

/ / /

/ / /

/ / /

1          The ALJ also addressed in the second decision the Appeals Council's observation

2  regarding stooping.  Specifically, the ALJ stated:

3             The Appeal Council also noted that . . . Dr. Borges had limited the
              claimant to occasional stooping, bending, and squatting and the State

4             Agency had limited the claimant to occasional stooping and crouching and
              that . . . these limitations were not addressed in the prior decision.

5

6             The undersigned has again reviewed the medical findings in this case and
              rejects the findings by Dr. Borges and the State Agency of limitations in
              stooping, bending, squatting, or crouching.  There are only limited

7             findings in regards to back and upper extremity pain and there is no
              evidence of recent treatment for pain.  Thus, the undersigned finds that the

8             claimant is not limited in her ability to stoop, bend, squat, or crouch. . . .

9  As with left hand gross manipulation, it is clear that, upon re-evaluation of the evidence, the ALJ

10  rejected any limitation Dr. Borges may have opined with respect to stooping.

11          Turning to plaintiff's specific argument that the ALJ erred by failing to recontact

12  Dr. Borges for clarification of his opinion, the court concludes that the duty to recontact was

13  never triggered.  The evidence was neither ambiguous nor inadequate.  Because the duty to

14  recontact was never triggered, it was not appropriate to do so and, for this reason, the ALJ

15  adequately adhered to the Appeals Council's instructions on remand, which in this case only

16  required the ALJ to re-evaluate Dr. Borges' opinion.

17          The next issue raised by plaintiff is whether, generally, the ALJ properly rejected

18  Dr. Borges' opinions regarding gross manipulation and stooping.  As indicated above, Dr. Borges

19  concluded that plaintiff could frequently use her left hand and occasionally stoop.  As to

20  plaintiff's left hand, the ALJ found that plaintiff could only occasionally do tasks requiring fine

21  manipulation (i.e., fingering), but rejected any limitation to gross manipulation (i.e., handling)

22  because such a limitation was not indicated by the opinions of other doctors or Dr. Borges' own

23  clinical findings.  Similarly, because of limited evidence relating to back problems and limited

24  treatment for such problems, the ALJ concluded that plaintiff was unlimited in her ability to

25  stoop.  The court finds that these are specific and legitimate reasons for rejecting limitations with

26  respect to handling and stooping.

1          The court also finds that the ALJ's analysis is supported by substantial evidence in

2   the record as a whole.  The record contains three residual functional capacity assessments by

3   agency consultative doctors.  On June 29, 2000, an agency consultative doctor opined that

4   plaintiff was limited in her ability to do tasks involving handling.  However, On October 24,

5   2000, another agency consultative doctor found that plaintiff did not have any manipulative

6   limitations.  Neither of these assessments addressed stooping.  A third assessment was completed

7   by Dr. Nguyen on September 19, 2003.  Dr. Nguyen opined that plaintiff could only occasionally

8   stoop and could frequently do fingering tasks on the left.  Thus, Dr. Nguyen is the only agency

9   consultative doctor out of the three who prepared assessments who opined as to a stooping

10  limitation.  No agency consultative doctor found a handling limitation and, as to stooping, the

11  ALJ was entitled to accept the assessments of the two doctors who prepared assessments in 2000

12  over the contradicted assessment of Dr. Nguyen in 2003.

13         The record also contains a June 14, 2000, report following a complete

14  neurological examination performed by agency examining doctor Jordan.  Dr. Jordan's

15  impressions were exaggerated complaints of back tenderness and exaggerated complaints of

16  upper left extremity tenderness and "give-way weakness."  On examination, there was no joint

17  instability, subluxation, or tremor and strength was "5/5 in all limbs," although grip strength

18  tested weaker on the left.  In her functional capacity assessment, Dr. Jordan stated that

19  "examination shows limited associated objective findings and apparent additional functional or

20  non-organic overlay."  Dr. Jordan concluded that plaintiff is able to "reach, handle, manipulate,

21  and use push-pull devices and foot controls."  He concluded by stating that "[e]xamination is

22  otherwise benign and reveals no objective findings of other significant physical limitation."

23  Thus, despite apparent weakened grip strength on the left, Dr. Jordan did not conclude that

24  plaintiff was limited with respect to either handling or stooping.  Dr. Jordan's conclusions are

25  consistent with those of two of the three agency consultative doctors and, as such, the ALJ was

26  entitled to rely on them.

1    The record also contains two physical capacity assessments completed by

2  plaintiff's treating physician – Dr. Wu-Hsiung.  On October 17, 2001, Dr. Wu-Hsiung indicated

3  that plaintiff was limited in her ability to bend, but did not indicate a total restriction on tasks

4  involving bending.  The doctor did not indicate any limitation on handling.  On April 11, 2003,

5  Dr. Wu-Hsiung stated that plaintiff was not limited with respect to repetitive hand and/or finger

6  movements but that she could only occasionally stoop.  The court observes, however, that these

7  conclusions appear to be based on plaintiff's subjective complaints and are not accompanied by

8  references to any specific objective clinical findings.  Dr. Wu-Hsiung never opined any limitation

9  on handling and, as to stooping, the ALJ was entitled to reject the doctor's unsupported

10 conclusion.

11    For all the above reasons, the court concludes that the ALJ was not required to

12 recontact Dr. Borges and that the ALJ properly rejected any limitations on handling or stooping.

13    2.    <u>Dr. Smith</u>

14    Plaintiff argues that the ALJ erred in rejecting the opinion of her treating

15 psychiatrist – Dr. Smith – regarding her mental limitations.  She asserts that "instead of crediting

16 Dr. Smith's findings, the ALJ credited Dr. Glaemian's [sic] consultative report."[9]  Specifically,

17 plaintiff argues:

18    . . . The ALJ assigned Dr. Glaemian's report "significant weight"
     opining that it was "supported by objective findings and is consistent with
19    the body of evidence." TR 23.  Dr. Glaemian, was a consultative examiner
     who saw Ms. Thao once without benefit of Dr. Smith's evaluation and
20    treatment notes.  Indeed, Dr. Glaemian specifically cautioned that further
     testing and evaluation were needed for a proper Axis I diagnosis.  He
21    stated:

22        This writer should emphasize that this conclusion is strictly
         based on the claimant's psychopathology, disregarding
23        possible chronic pain and physical limitations. To fulfill the
         consistency of Axis I, diagnosis and clarify any area of

24

25    [9]    The agency examining psychiatrist's name appears in the ALJ's decision as both
   "Glaemian" and "Ghaemian."  A review of the doctor's report reveals that the correct spelling is
26 "Ghaemian."

1               malingering, the claimant needs neuropsychological testing
that will definitely help us identify any possible area of
2               current active psychosis or depressive disorder.
Reevaluation and follow up with a psychiatric clinic with
3               close monitoring for improvement of symptoms in response
to treatment, as well as availability of these reports to the
4               next evaluator, is recommended as well.

5         TR 358.

Nevertheless, ALJ Ramsey accorded Dr. Glaemian's consultative opinions
6         "significant weight." TR 23.

7  Regarding Drs. Smith and Ghaemian, the ALJ stated:

8               As to the claimant's emotional state, Dr. Glaemian, examining
psychiatrist, found that considering the claimant's linguistic and
9               educational level and poor background as well as the possible presence of
a mild dysphoric disorder, she was capable of only performing simple
10              repetitive jobs on a regular basis in a work-like environment.  He noted
that the ability to perform detailed and complex jobs was questionable and
11              needed long-term training and reassessment.  Dr. Glaemian noted further
that the claimant was able to concentrate for an eight-hour simple job and
12              respond appropriately to minimal stressors in a job setting or basic changes
in a work-like environment.  Dr. Glaemian recommended
13              neuropsychological testing to clarify an Axis I diagnosis and any area of
malingering in light of the claimant's total confusion upon examination.
14              Dr. Glaemian particularly brought into question the claimant's current
confusion upon examination and her reported ability to drive a car and
15              take her children to and from school (Ex. C-5F).  As Dr. Glaemian's
opinion is supported by objective findings and is consistent with the body
16              of evidence, the undersigned assigns it significant weight.

17              With little in the way of detailed analysis in a January 2003 assessment,
David Smith, M.D., treating psychiatrist at Sacramento Mental Health,
18              assessed the claimant as moderately-severely impaired in all emotional
facets by recurrent major depressive disorder and noted the claimant's
19              problems with physical weakness.  He assessed a severe/extreme
impairment in the ability to relate to other people; to perform daily
20              activities; and perform complex tasks in a full-time work setting.  He
noted a moderate/severe estimated degree of constriction of interests and
21              in the ability to perform work where contact with others would be
minimal.  As to the estimated degree of deterioration on personal habits;
22              the ability to comprehend and follow instructions; the ability to perform
work requiring frequent contact with others; and the ability to perform
23              simple tasks in a full-time work setting; there was moderate limitation.
The undersigned finds the assessment of Dr. Smith somewhat exaggerated
24              in light of the claimant's history and in her demonstrated effort upon
examination and, therefore, assigns it modest weight.

25

26  ///

28

In making this assessment, the undersigned has considered the new treatment records provided at Exhibit 17F.[10]  While these records continue to support a finding that the claimant has a depressive disorder, as noted, they show that she has not been compliant with treatment but when she takes her medications, her symptoms improve.  This is consistent with the undersigned's determination that the claimant's depressive disorder only limits her to unskilled work.

The court finds it troubling that the ALJ gave such great weight to Dr. Ghaemian's assessment.  In particular, the court notes that Dr. Ghaemian stated in this report that "claimant's true functional state at this time is not clear."  He added that he was unable to assign a GAF score due to incomplete information and that "the nature of the claimant's current psychopathology is questionable and unclear."  As plaintiff observes and as the ALJ acknowledged in his decision, Dr. Ghaemian stated that further testing was necessary to determine an Axis I diagnosis.  Given Dr. Ghaemian's own uncertainty, it is surprising that the ALJ was able to rely on his report to draw any conclusions.  While the court agrees with the ALJ that Dr. Smith's opinion does not appear to be supported by reference to objective clinical findings, it was not appropriate for the ALJ to reject Dr. Smith's assessment based on Dr. Ghaemian's uncertain conclusions.  A remand is appropriate to allow the ALJ an opportunity to re-evaluate the record and to state reasons – other than Dr. Ghaemian's uncertain assessment – for rejecting Dr. Smith's opinions.

3.    Dr. Wu-Hsiung

Plaintiff argues that the ALJ erred in rejecting Dr. Wu-Hsiung's opinion that plaintiff could not perform even sedentary work on a full-time basis.  Specifically, plaintiff contends:

In this case, the ALJ first rejected the opinions of Ms. Thao's long-time treating physician, Dr. Wu-Hsiung.  It was Dr. Wu-Hsiung's opinion that during an eight-hour work day, Ms. Thao would be able to stand/walk for 0-2 two hours at a time with a total of 2-4 four hours in the entire day

---

[10]    The index to the certified administrative record does not list an "Exhibit 17F."

1    because of pain and weakness.  It was also his opinion that in an eight-
hour work day, she would be able to sit 0-2 hours at a time and 2-4 hours

2    total hours during the day because of pain and weakness.  The evaluation
reflected that Ms. Thao was able to lift/carry a maximum amount of ten

3    pounds on an occasional basis and should not engage in repetitive
movements using her feet due to pain and weakness.  It was Dr. Wu-

4    Hsiung's further opinion that because of pain and weakness, Ms. Thao
would only be able to occasionally climb; never balance; occasionally

5    stoop, kneel, crouch, crawl; occasionally reach below the knees;
occasionally reach from waist to knees; occasionally reach from waist to

6    chest; and occasionally reach from chest to shoulders, or above her
shoulders.  The report also reflected that Ms. Thao's Imipramine and

7    Soma medications could cause drowsiness and upset stomach and might
affect her ability to work. TR 337.

8        ALJ Ramsey, however, failed to even mention Dr. Wu-Hsiung's
findings.  With respect to the We-Care medical records in general, ALJ

9    Ramsey stated:

10        . . . the records from We-Care Medical Center are consistent with a
finding that the claimant remains capable of performing medium

11        work which involves occasional overhead reaching and occasional
fingering with the left hand and a restriction from climbing ropes

12        and scaffolds.

13    TR 23.
        In fact, given Dr. Wu-Hsiung's findings, Ms. Thao would not even

14    be capable of performing light or even sedentary work on a full time basis.
(footnote omitted).  Much less, medium work.  Nevertheless, the ALJ

15    completely ignored and thereby tacitly rejected Dr. Wu-Hsiung's opinions
regarding Ms. Thao's abilities and limitations.  As briefed in Section I, the

16    ALJ also rejected the concurring opinions of Dr. Borges and the State
Agency reviewers regarding Ms. Thao's stooping, kneeling, crouching,

17    and crawling limitations.

18    Because the court has already addressed the ALJ's evaluation of Dr. Wu-Hsiung's opinion

19    regarding stooping, the court will now focus on Dr. Wu-Hsiung's other opinions.

20        Dr. Wu-Hsiung opined that plaintiff was totally disabled due to limitations in the

21    following areas:  (1) kneeling, crouching, and crawling; (2) standing, walking, and sitting;

22    (3) lifting and carrying; (4) repetitive use of the feet; (5) climbing and balancing; (6) reaching;

23    and (7) effect of medications.  These opinions are revealed in two physical capacity assessments

24    dated October 17, 2001, and April 11, 2003.  In the October 2001 assessment, Dr. Wu-Hsiung

25    concluded that plaintiff could walk less than one hour without interruption; stand less than one

26    hour without interruption; and sit one to two hours.  Dr. Wu-Hsiung stated that plaintiff could

1   occasionally lift/carry up to ten pounds, but never lift/carry more weight than that.  The doctor

2   also felt plaintiff was totally precluded from climbing.   In the April  2003 assessment, Dr. Wu-

3   Hsiung stated that, in an eight-hour day, plaintiff could only stand/walk/sit for up to two hours at

4   a time for up to a total of four hours.  Dr. Wu-Hsiung stated that plaintiff was restricted in her

5   ability to use her feet for repetitive movements.  For plaintiff's lift/carry ability, the doctor

6   indicated that she could occasionally lift up to ten pounds.  The doctor stated that plaintiff could

7   never balance, but could occasionally climb, stoop, kneel, crouch, crawl, and reach.

8           The record also contains very limited treatment notes by Dr. Wu-Hsiung, most of

9   which are not legible.  Those that are legible reveal the following entries:

10          11-4-1999     Left arm weak.

11          12-7-1999     Have seen neurologist; arthritis.

12          1-5-2000      Patient seen by neurologist; muscular atrophy.

13          2-4-2000      Pain, weak; use arm braces.

14          7-26-2000     Left arm; old fracture/dislocation & nerve loss; passive range of
                          motion; general body pain.

15

16  While these notes reference plaintiff's subjective complaints of pain and weakness, there are no

17  indications of results of objective testing.  Similarly, as to the assessments completed by Dr. Wu-

18  Hsiung on October 2001 and April 2003, there are no citations to objective clinical findings.  In

19  the October 2001 assessment, Dr. Wu-Hsiung stated that his opinion was based on "physical

20  sign, laboratory" although no specific objective findings are noted.  The only "findings" listed

21  are:  "pain on the limbs and headache, general weakness," "weakness, pain," and ". . . weakness,

22  pain, depression."  These are all subjective complaints, not objective findings.  Again, while the

23  doctor generally referenced "clinical correlation" and "poor therapeutic response," no actual

24  clinical findings are mentioned.  Likewise, the April 2003 assessment obliquely refers to "pain"

25  and "weakness" but does not cite to any objective findings.

26  / / /

1    Given that Dr. Wu-Hsiung's assessed limitations are not supported by objective

2  findings, they do not undermine the ALJ's conclusion that plaintiff could perform medium work

3  with some limitation.  Because they are unsupported by objective findings, Dr. Wu-Hsiung's

4  treatment notes and assessments are neither probative nor significant.  As defendant notes, the

5  ALJ is not required to consider such evidence.  See Vincent v. Heckler, 739 F.2d 1395, 1394-95

6  (9th Cir. 1984).  Thus, the ALJ did not err by failing to discuss these records.

7    To the extent the ALJ was required to discuss Dr. Hsiung's records and erred by

8  failing to do so, the court finds that any error is harmless.  The Ninth Circuit has applied

9  harmless error analysis in social security cases in a number of contexts.  For example, in Stout v.

10  Commissioner of Social Security, 454 F.3d 1050 (9th Cir. 2006), the court stated that the ALJ's

11  failure to consider uncontradicted lay witness testimony could only be considered harmless

12  ". . . if no reasonable ALJ, when fully crediting the testimony, could have reached a different

13  disability determination."  Id. at 1056; see also Robbins v. Social Security Administration, 466

14  F.3d 880, 885 (9th Cir. 2006) (citing Stout, 454 F.3d at 1056).  Similarly, in Batson v.

15  Commissioner of Social Security, 359 F.3d 1190 (9th Cir. 2004), the court applied harmless error

16  analysis to the ALJ's failure to properly credit the claimant's testimony.  Specifically, the court

17  held:

18    However, in light of all the other reasons given by the ALJ for
     Batson's lack of credibility and his residual functional capacity, and in
19    light of the objective medical evidence on which the ALJ relied there was
     substantial evidence supporting the ALJ's decision.  Any error the ALJ
20    may have committed in assuming that Batson was sitting while watching
     television, to the extent that this bore on an assessment of ability to work,
21    was in our view harmless and does not negate the validity of the ALJ's
     ultimate conclusion that Batson's testimony was not credible.
22
     Id. at 1197 (citing Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)).
23

24  In Curry, the Ninth Circuit applied the harmless error rule to the ALJ's error with respect to the

25  claimant's age and education.

26  / / /

1    In this case, any reasonable ALJ reviewing Dr. Wu-Hsiung's treatment notes and

2    assessments would conclude that they had no bearing on the disability determination given that

3    they are unsupported by any objective findings and would have rejected the doctor's opinions for

4    this reason.  Therefore, any error was harmless.

5    **B.    Residual Functional Capacity Assessment**

6    Plaintiff argues that the ALJ did not account for her "non-exertional impairments

7    and functional limitations" in his residual functional capacity assessment.  Specifically, she

8    argues that the ALJ failed to include the physical limitations assessed by Drs. Wu-Hsiung and

9    Borges.  She also argues that the ALJ failed to include her mental limitations.  The court has

10   discussed the ALJ's assessment of Dr. Wu-Hsiung's opinion in detail above and finds that the

11   ALJ properly rejected it.

12   As to Dr. Borges, plaintiff now focuses on his opinion that her ability to stand and

13   walk is limited to "a total of six hours a day on a noncontinuous basis. . . ."  The ALJ did not

14   include any standing or walking limitations in his residual functional capacity assessment.

15   However, Dr. Jordan reported in June 2000 that "[s]itting, standing, and walking are estimated at

16   2 hours continuously and 6 hours total."  This suggests that plaintiff cannot stand and/or walk

17   continuously for more than two hours and, non-continuously, for up to six hours.  This is

18   consistent with Dr. Borges' limitation.  Similarly, in June 2000, October 2000, and September

19   2003, agency consultative doctors opined that plaintiff could sit about six hours in an eight-hour

20   day with normal breaks.  The need for breaks suggests that plaintiff cannot sit continuously for

21   six hours.  A limitation for required breaks is also consistent with Dr. Borges' opinion.  The ALJ

22   does not explain why this limitation – which all the doctors found – is excluded from his residual

23   functional capacity assessment.

24   / / /

25   / / /

26   / / /

33

1       The court next turns to limitations associated with plaintiff's mental impairments.

2 As stated above, the ALJ concluded that plaintiff has the residual functional capacity for simple

3 unskilled medium work with some physical restrictions.  Other than limiting plaintiff to unskilled

4 simple work, the ALJ did not find any limitations relating to plaintiff's mental impairments.

5 However, in June 2000, agency examining psychiatrist Dr. Greenleaf opined that plaintiff was

6 limited to work with little peer or public contact.   In July 2000, an agency consultative doctor

7 opined that plaintiff was moderately limited with respect to her ability to work in coordination

8 with others without being distracted and to accept instructions and criticism from supervisors.  In

9 January 2003, Dr. Smith opined that plaintiff was impaired in her ability to relate to and work in

10 even minimal contact with others.  In October 2003, agency consultative doctor Tyl stated that

11 plaintiff is moderately limited in her ability to interact appropriately with the general public.  The

12 ALJ does not provide any analysis of the assessments provided by the agency doctors regarding

13 plaintiff's difficulty working with others.

14       The court agrees with plaintiff that the ALJ's residual functional capacity

15 assessment does not accurately reflect plaintiff's limitations in that there is no discussion of the

16 requirement for breaks with respect to sitting, standing, and/or walking during an eight-hour

17 period, or the requirement that plaintiff avoid contact with others in the work setting.  Again, a

18 remand is appropriate to allow the ALJ to further consider these limitations.

19     **C.**    **Examination of the Vocational Expert**

20       Plaintiff argues generally that the hypothetical questions posed to the vocational

21 expert did not accurately reflect her residual functional capacity because they did not include all

22 of plaintiff's exertional and non-exertional limitations.  At the second hearing, the ALJ described

23 plaintiff's residual functional capacity to the vocational expert as follows:

24         Medium work. . . . [¶] . . . She's limited to simple unskilled work, tasks
        which involve only occasional overhead reaching.  She's limited to

25         occasional reaching with the left arm and occasional fingering with the left
        hand, the non-dominant hand.  She is restricted from climbing ropes and

26         scaffolds.  So those are the limitations.  Right hand, no limitations.

For the reasons discussed above, the court finds that the ALJ's residual functional capacity description fails to reflect plaintiff's exertional limitation of a requirement for breaks, and plaintiff's non-exertional limitation of avoiding contact with others in a work setting.  Therefore, the hypothetical question was inadequate to elicit probative vocational testimony.

## V.  CONCLUSION

For the foregoing reasons, this matter will be remanded under sentence four of 42 U.S.C. § 405(g) for further development of the record and/or further findings addressing the deficiencies noted above.

Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment (Doc. 19) is granted;

2.      The Commissioner's cross motion for summary judgment (Doc. 25) is denied;

3.      This matter is remanded for further proceedings consistent with this order; and

4.      The Clerk of the Court is directed to enter judgment and close this file.

DATED: September 5, 2008

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE